# IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| NICOLE GABRIELLE COTE,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 72214 |

FILED

JUL 3 0 2018

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY
DEPUTY CLERK

18-29233

## *ORDER VACATING JUDGMENT AND REMANDING*

This is a direct appeal from a judgment of conviction, pursuant to a jury verdict, of two counts of driving under the influence causing substantial bodily harm and two counts of reckless driving causing substantial bodily harm to another. Second Judicial District Court, Washoe County; William A. Maddox, Judge.

### *FACTUAL AND PROCEDURAL HISTORY*

Nicole Cote was indicted for felony charges related to an automobile accident that occurred while she was under the influence of intoxicating substances and caused serious injuries to two victims. Prior to trial, the parties appeared before the district court for a hearing on motions to suppress evidence.

*Motion to suppress blood draw*

Defense counsel first argued that Cote did not voluntarily give consent for a blood draw; therefore, evidence of the blood draw should be suppressed. Cote did not testify at the hearing. However, testimony by three officers revealed the following:

After the accident occurred, Officer Proffitt arrived on scene and interviewed Cote. She informed him that she had one drink four hours earlier and that she had been involved in a minor fender bender just prior to the accident at issue. Officer Proffitt testified that when he told Cote that

she may have to do a blood draw due to the severity of the accident, Cote "agreed." When the prosecutor asked him the circumstances of that consent, Officer Proffitt testified, "I don't remember her exact words, but she was—she seemed like she'd be okay with it." Officer Proffitt testified that based on the information available to him at that time, he would not have been able to get a warrant for a blood draw, absent consent, and would not have sought one.

Officer Proffitt then asked Officer Sanford to administer roadside sobriety tests, all of which Cote passed. Officer Sanford administered a preliminary breath test, which resulted in no evidence of alcohol. Officer Sanford testified that he then spoke with Cote about the accident and she informed him that she had consumed an alcoholic drink four hours prior and had smoked marijuana the day before. Officer Sanford then testified that he talked with Cote about providing a voluntary blood sample, to which she agreed. He stated Cote did not ask questions and was cooperative. Officer Sanford then read aloud to Cote the implied consent warning form. He testified that Cote agreed to the blood draw and signed the form. Officer Sanford further testified that, although the warning form does not clearly state that the suspect has the right to decline the blood draw, he discussed this right with Cote. He also testified that he never stated to Cote that he would seek a warrant if she refused the blood draw. The warning form with Cote's signature was submitted into evidence.

Officer Sanford then transferred Cote to the Washoe County Sheriff's station in the front seat of the patrol car, for the purpose of administering the blood draw. She was not handcuffed and Officer Sanford testified that she was not under arrest. Officer Sanford requested a blood

draw for marijuana and alcohol, which was administered at the Sherriff's station, and then returned Cote to the scene of the accident.

Cote was then interviewed by Detective Cecil. Detective Cecil recorded their interview and Cote stated she had voluntarily consented to the blood draw and had not been coerced. Detective Cecil testified that he took Cote's cell phone from her, for evidentiary purposes, at the end of the interview. He testified that it was possible that Cote may have been in shock from the accident but that she had refused any medical care and had no visible symptoms of distress. All three officers testified that Cote did not demonstrate any signs of intoxication throughout their interviews and that at no point during this process was Cote under arrest. They also all testified that there were multiple armed and uniformed officers on scene at all times and that Cote was never out of the presence of a police officer.

The blood test later revealed that Cote had a blood alcohol level of 0.066 and she had 5.6 nanograms of marijuana and 31 nanograms of marijuana metabolite in her blood. Based on the evidence presented at the motions hearing, the district court denied the motion to suppress the blood draw, finding Cote consented based on the totality of the circumstances.

*Jury Trial*

At trial, testimony revealed that Cote and the other driver involved in the prior fender bender engaged in conversation at the scene, but Cote was upset and left hurriedly, screeching her tires and cutting across four lanes of traffic. Cote then "went up on the median, swerved back and forth, [and] tr[ied] to correct her vehicle, and remain under control." She ran a red light and was travelling above the speed limit. A witness to the subsequent injury accident described that oncoming traffic had stopped due to congestion and a driver waved at the victim-driver to allow him to cross the lane into a parking lot. Cote then drove into the bike or storage

lane and hit the victim-driver's car. The victim-driver's car was "air-lifted up, twisted around," and hit a telephone pole. Both the driver and his passenger suffered severe injuries.

An eyewitness testified regarding Cote's demeanor after the accident. The witness noted that Cote did not show a lot of emotion or remorse, but that she became more frightened when police arrived. The witness further stated that:

> [State:] How would you describe the defendant's driving on December 19th of 2014?
> [Witness:] I would describe that as reckless endangerment, even clear up to driving with the intent to kill.
> [State:] How so?
> [Witness:] It was disregard[ ] for everybody else on the roadway. There was disregard all the way around for the safety of herself and the people around her.

Defense counsel failed to object to the above testimony and the district court did not strike it from the record.

The witness further stated that Cote confessed at the scene, stating, "I know this was my fault. I shouldn't have been driving. I'm running from domestic violence. My boyfriend beats me." Cote testified and admitted to driving onto the median and going 54 miles per hour because she was driving away from her feelings. She stated she did not see the victim's car "until it was too late." The jury convicted Cote of two counts of driving under the influence causing substantial bodily harm and two counts of reckless driving causing substantial bodily harm to another. The district court then imposed an aggregate sentence of 60 to 240 months, running the reckless driving sentences concurrent with the DUI sentences.

## DISCUSSION

On appeal, Cote argues: (1) there was insufficient evidence to convict her; (2) the jury instruction on proximate cause was erroneous and

 

placed on Cote an improper burden of proof; (3) the district court erred by denying the motion to suppress evidence; (4) the district court abused its discretion by admitting improper lay witness testimony; (5) the district court allowed inadmissible bad act evidence into trial; (6) the prosecutor committed misconduct; (7) the district court erred by failing to grant the State's request to dismiss Cote's reckless driving convictions; and (8) Cote's sentence violates the Eight Amendment.[1]

*The district court erred by denying the motion to suppress the blood draw*

Cote argues that the district court erred by failing to suppress the blood results because her consent was not voluntary. Findings of fact in a suppression hearing will not be disturbed on appeal if supported by substantial evidence. *State v. Ruscetta*, 123 Nev. 299, 304-05, 163 P.3d 451, 455 (2007). However, the court reviews the legal consequences of those factual findings de novo. *Somee v. State*, 124 Nev. 434, 441, 187 P.3d 152, 157-58 (2008).

A blood draw is a search that is governed by the Fourth Amendment to the United States Constitution's prohibition against unreasonable searches and seizures. *Schmerber v. California*, 384 U.S. 757, 767 (1966). Thus, a warrant or a recognized exception to the warrant requirement is necessary to justify a blood draw. *See Byars v. State*, 130 Nev. 848, 852, 336 P.3d 939, 942 (2014). One of those recognized exceptions is consent. "A search pursuant to consent is constitutionally permissible if the State demonstrates that 'the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *McMorran v. State*, 118 Nev. 379, 383, 46 P.3d 81, 83 (2002) (internal quotation omitted).

---

[1]Because we find that the district court erred by failing to suppress evidence of the blood draw, we need not address the remaining arguments.

Moreover, "[v]oluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Id.* (internal quotation omitted).

In *Bumper v. North Carolina*, the United States Supreme Court determined that when police officers informed a resident that they had a warrant to search her home, the resident's subsequent consent to that search was invalid. 391 U.S. 543, 549-50 (1968). The Court noted that "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion . . . Where there is coercion there cannot be consent." *Id.* at 550. Similarly, the Ninth Circuit has held that "if . . . officers . . . coerce[d] [motorists] into believing that they had no authority to withdraw their consent, the officers violated [the motorists] Fourth Amendment rights and the search was illegal." *United States v. McWeeney*, 454 F.3d 1030, 1036 (9th Cir. 2006). Thus, mere acquiescence to the mandates of authority does not constitute consent. Cote argues that, under the totality of the circumstances, her consent was involuntary because she was given no real opportunity to deny consent.

Officer Sanford arrived on scene, administered field sobriety tests, and found no evidence that Cote was intoxicated. The officer was then instructed by his superiors to administer a blood test based on the severity of the accident, assuming he could get Cote's consent. The officers testified that it is standard procedure to ask drivers in critical accidents for their consent to a blood draw. Based on the testimony, Cote consented to the blood draw prior to receiving the warning form and prior to any mention of

the officers obtaining a warrant. After agreeing to the blood draw, Cote was provided an implied consent warning form and signed it. Cote argues that the language of that form contributed to the involuntariness of her consent, because it gives no meaningful opportunity to deny consent. Specifically, the warning states: "If you do not consent to the requested chemical test, the law allows me to apply for a court order authorizing the withdrawal of up to three samples of your blood without your consent, using reasonable force if necessary. . . . Testing will not be delayed in order for you to speak to an attorney."

The warning, fairly read under the circumstances, indicates that the reader is suspected of driving under the influence, and that failure to consent to a blood draw will inevitably lead to a court order for a forced blood draw. The language of the warning indicated that Cote was suspected of driving under the influence, despite the fact that the officers admit they likely would not have sought a warrant without Cote's consent due to lack of probable cause. The document read in totality could very well lead a reasonable person to believe that they will be subject to a court ordered blood draw if they fail to give one voluntarily.

While we agree that the warning was unfairly coercive, the manner of presentation of the warning in Cote's case did not destroy her ability to give valid consent to the blood test. Rather, there was substantial evidence provided at the hearing to support the district court's finding that Cote's initial consent to the blood draw was voluntary as it occurred prior to presentation of the warning and prior to prolonged time in police presence. Cote did not testify and all of the officers present at the scene testified that she was fully cooperative throughout the entire process and never indicated any unwillingness or reluctance to proceed with the blood

draw. Moreover, both Officer Proffitt and Officer Sanford testified that Cote's consent to the blood draw came prior to the warning or any mention of obtaining a warrant. Officer Sanford also expressly informed Cote that she had a right to decline to undergo the blood draw.

Thus, there is substantial evidence supporting the conclusion that Cote's *initial* consent to Officers Proffitt and Sanford was voluntary. However, the next inquiry is whether Cote, after having been given the warning, was thereafter "free to withdraw or limit" her consent. *Byars*, 130 Nev. at 857, 336 P.3d at 945. "Just as consent must be freely given, a person must be free to withdraw or limit it." *Id.* "[L]aw enforcement officers may not 'coerce a citizen into believing that he or she had no authority to enforce' the right to withdraw consent." *Id.* (quoting *United States v. McWeeney*, 454 F.3d 1030, 1035-36 (9th Cir. 2006)). Whether the officers coerced Cote into believing she had no authority to withdraw her consent is a factual determination, which looks to "whether the officers' conduct is objectively recognizable as intimidation directed mostly (or exclusively) at coercing [the defendant] into believing that [she] had no right to withdraw or delimit [her] consent once it was given, and whether a reasonable person faced with the officers' conduct would have believed that no such right existed." *McWeeney*, 454 F.3d at 1037. In addition to the language of the warning, Cote also argues that her consent was involuntary due to the fact that she was in police custody, that all the officers present were armed, that she was never read her *Miranda* rights, that the interviews with Officers Proffitt and Sandford were not recorded, and that she may have been in shock from the accident.

While Cote initially consented to the blood draw, we hold that this consent was rendered involuntary based on the subsequent

circumstances of the blood draw. After Cote's initial consent, she was presented with a written warning that indicated that a decision to withdraw her consent would be futile because the officers would seek a warrant to obtain the blood draw, with force if necessary. While Officer Sanford may have informed Cote that she could refuse to consent to the blood draw prior to her signing the warning, there is no evidence that she was informed she could withdraw her consent after signing the warning. Moreover, the warning informed Cote that she was suspected of driving under the influence and that the process would not be delayed in order for her to speak to an attorney. That she was then placed in a police car and driven to the Sheriff's office would not lead a reasonable person to believe that she was free to withdraw her consent at any time. Furthermore, Cote had never been arrested before, had just been involved in a serious accident, and was allegedly fleeing a domestic violence incident. These facts create a situation in which there is neither a reasonable subjective nor objective belief that the right to withdraw one's consent still remained.

Moreover, in this particular situation, the officers had insufficient probable cause to seek a warrant and testified that they likely would not have done so without Cote's consent. While Nevada imposes harsh punishment on those who are arrested for a DUI and refuse to consent to a blood draw, therefore requiring officers to seek a warrant, *see* NRS 484C.210(1)(a); *Schroeder v. State, Dep't of Motor Vehicles & Pub. Safety*, 105 Nev. 179, 182, 772 P.2d 1278, 1280 (1989), these consequences require the existence of probable cause. Here, the officers testified that, regardless of the existence of probable cause, their policy is to *always* try to get the driver's consent to obtain a blood draw in critical accidents. A search predicated *purely* on consent cannot merit the same consequences; and to

Supreme Court
OF
Nevada

(O) 1947A

9

inform the suspect otherwise, is coercive. By providing Cote with the warning and creating a situation in which a reasonable person would believe she was under arrest for driving under the influence, the officers created a situation that is objectively recognizable as intimidation directed at coercing the driver into not withdrawing consent. Accordingly, we conclude that Cote's consent was not voluntary and the district court erred by failing to suppress evidence of the blood draw.

*It was plain error for the district court to allow a witness to testify to inadmissible lay opinion*

Cote argues that the lay witness who testified that Cote lacked remorse and described Cote's driving as "reckless endangerment, even clear up to driving with intent to kill," provided inadmissible opinion testimony by making statements regarding Cote's state of mind. We agree. Despite the defense counsel's failure to object, we conclude that admission of this testimony was plain error. Failure to object during trial generally precludes appellate consideration of an issue; however, despite such failure, "this court has the discretion to address an error if it was plain and affected the defendant's substantial rights." *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003) (internal quotation omitted); *see also* NRS 178.602. A lay witness may offer an opinion or inference that is "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." NRS 50.265. However, even relevant evidence may be inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. NRS 48.035.

We conclude the witness' testimony amounted to an inadmissible legal conclusion and was not rationally based on the witness' perception of the accident. Not only was the witness allowed to testify to

Supreme Court
of
Nevada

(O) 1947A

Cote's state of mind, but the language used also directly and conclusively parroted essential elements of the crime charged. This was not rationally related to the witness's perception of the events, and even if "helpful" to the extent that it relieved the jurors of making up their own minds, the unfair prejudice posed by the statement substantially outweighed any probative value. That the prosecutor then asked a follow-up question and elicited more inappropriate testimony compounds the error. While it is a defense attorney's responsibility to object to this type of testimony at trial, it is also the prosecutor's responsibility to avoid eliciting it, and, ultimately, the district court's responsibility to strike it from the record. We conclude that the admission of this testimony was plain error; however, we decline to reverse on those grounds.[2] Nevertheless, because we conclude that the district court erred in failing to suppress the blood draw evidence, we

ORDER the judgment of the district court VACATED AND REMAND this matter to the district court for proceedings consistent with this order.

_____, J.
Pickering

_____, J.
Gibbons

_____, J.
Hardesty

---

[2]As we are vacating and remanding this matter for a new trial, we decline to address the parties' additional arguments.

cc:    Chief Judge, The Second Judicial District Court
       Hon. William A. Maddox, Senior Judge
       Troy Curtis Jordan
       Attorney General/Carson City
       Washoe County District Attorney
       Washoe District Court Clerk

SUPREME COURT
OF
NEVADA

(O) 1947A